Paul B. GALVAN, Appellant,

v.

The STATE of Texas, Appellee.

Rose S. GALVAN, a/k/a Rose Slafani, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 3–84–257–CR, 3–84–258–CR.

Court of Appeals of Texas, Austin.

Oct. 30, 1985.

John K. Dietz, Austin, for appellants in both cases.

Charles D. Penick, Crim. Dist. Atty., Robert E. Raesz, Jr., Asst. Dist. Atty., Bastrop, for appellee.

Before POWERS, EARL W. SMITH and BRADY, JJ.

EARL W. SMITH, Justice.

A jury found appellants, Paul Galvan and Rose Galvan, (a/k/a Rose Slafani), guilty of the offense of injury to a child and assessed punishment at a jail sentence of fifty years. Tex.Pen.Code Ann. § 22.04 (Supp.1985). Appellants raise four grounds of error, all of which we will overrule. We affirm the judgment of the trial court.

On April 13, 1982, Cruz Galvan, an emergency medical technician (and Paul Galvan's uncle), was called to Paul and Rose Galvan's residence to check on their child Christopher, who they reported was having difficulty breathing. Cruz Galvan determined that the child was dead. He called a Justice of the Peace, who, without an autopsy, conducted an inquest. Sometime between 1:00 and 2:00 p.m. that afternoon, Christopher was buried in the family cemetery plot. At about the same time, although too late to prevent the burial, the Bastrop County District Attorney's Office was contacted. An order to exhume the body was issued and executed later that day. The body was transported to Austin, where Dr. Bayardo, the medical examiner, began an autopsy at approximately 5:00 p.m. that same day.

The medical evidence and autopsy conclusions are reviewed in detail under the discussion of appellants' ground of error concerning the sufficiency of the evidence. In brief, Dr. Bayardo observed that the child's body was dirty, and that the child was dressed in dirty clothes. The child appeared malnourished and dehydrated, had numerous bruises, and a severe, ulcerated diaper rash. At trial, Dr. Bayardo testified that the child died of a combination of factors. Dr. Norton, another forensic pathologist, summarized the cause of the child's death as active and passive neglect, and active abuse. The State introduced other medical evidence showing that the child's condition at death was attributable to neglect. The State also introduced evidence concerning the Department of Human Resources investigation into the case and the difficulties encountered in seeing the child.

The Galvans were convicted of Count One of a four-count indictment. Count One, in pertinent part, read as follows:

[Paul B. Galvan and Rose S. Galvan] intentionally and knowingly, by omission, engage[d] in conduct that caused serious bodily injury to Christopher Paul Galvan, a child younger than 14 years of age, by then and there knowingly omitting and failing to provide support and knowingly omitting to provide the minimal requirements of said child for food and medical care, and the said Paul B. Galvan and Rose S. Galvan aka Rose Sclafani were the parents of Christopher Paul Galvan and had the duty by statute to provide such support, food, and medical care for said child, and said parents could have provided and were legally obligated to provide such support, food and medical care, and there further being a statute providing that such omission is an offense.

Appellants acknowledge that the indictment is sufficient to allege the offense of injury to a child under *Ahearn v. State,* 588 S.W.2d 327 (Tex.Cr.App.1979), but claim that the indictment is defective because it is duplicitous.

## DUPLICITY OF THE INDICTMENT

■ By their first ground of error, the Galvans assert that the trial court erred in failing to grant their timely-made motion to quash the indictment on the ground that it was duplicitous. The rule against charging two distinct offenses in one indictment is long-established. Foreman, Indictments Under the New Texas Penal Code, 15 Hous.L.Rev. 1, 19–20 (1977) and cases cited therein. The rationale for the rule is that a duplicitous indictment does not give the defendant fair notice because he cannot tell against what charge he must defend. Exceptions to the rule exist. For example, an indictment is not duplicitous that alleges, conjunctively, more than one theory of committing the offense alleged. *Johnson v. State,* 623 S.W.2d 654, 655 (Tex.Cr.App. 1981).

Appellants' particular complaint is that Count One of the indictment violates the prohibition against one paragraph of an indictment charging more than one offense. Tex.Code Cr.P.Ann. art. 21.24(b) (Supp.

1985). Specifically, they complain that the indictment alleges the two distinct offenses of injury to a child and criminal non-support, Tex.Pen.Code Ann. §§ 22.04, 25.05 (1974 & Supp.1985). Appellants have failed to fully consider the applicability of § 6.01 of the Penal Code, *supra,* however, and its interaction with Tex.Code Cr.P.Ann. art. 21.24 (Supp.1985).

■ The cases annotated under art. 21.-24, *supra,* do not deal with the problem of duplicitous indictments that allege offenses by omission; *i.e.,* the interaction of art. 21.24 and § 6.01 of the Penal Code. Section 6.01 provides that "[a] person who omits to perform an act does not commit an offense unless a statute provides that the omission is an offense or otherwise provides that he has a duty to perform the act." Section 6.01 provides two alternatives that render omissive conduct an offense: (1) a statute makes such an omission an offense; or (2) a statute provides that the person has a duty to perform an act, and the person failed to perform that act. Unless § 6.01 is satisfied, conduct consisting of omitted acts cannot be a crime.

■ Count One of the indictment charges that the Galvans intentionally and knowingly "by *omission,* engage[d] in conduct that caused serious bodily injury...." (emphasis added). For the Galvans' omissive conduct to be an offense under § 6.01, there must be a statute making that omission an offense or a statute providing that the Galvans had a duty to perform those acts that the indictment charges they failed to do. Rather than alleging two distinct offenses, as the Galvans assert, the indictment tracks § 6.01 of the Penal Code and alleges two ways of satisfying the requirement for offenses by omission—a statute making the omission an offense *and* a statute imposing a duty to act; a conjunctive allegation of more than one theory of the offense. An indictment is not duplicitous when it alleges, conjunctively, more than one theory of the same offense. *Johnson, supra.*

■ Appellants claim that the duty to support a child arises exclusively under Tex.Fam.Code Ann. § 12.04 (Supp.1985) and that § 25.05 of the Penal Code could not be the source of a duty to support so as to be one way of satisfying § 6.01's requirements. Therefore, if § 25.05 of the Penal Code is alleged, it is as a separate offense, not as a manner of committing the offense of injury to a child by omissive conduct. Appellants cite no controlling cases. The cases cited stand for the proposition that an indictment must allege a parent-child relationship in order to show a duty to support a child and thus satisfy one alternative of § 6.01(c) in order to allege injury to a child by omissive conduct. They do not stand for the proposition that § 12.04 of the Family Code is the exclusive source of that duty, however. For example, *Moss v. State*, 598 S.W.2d 877 (Tex.Cr. App.1980) deals with the sufficiency of an indictment for murder and the need for an allegation of "parent" to show the parent-child relationship and thus establish a duty to support. Section 12.04 of the Family Code is cited as a source of that duty, but there is no suggestion that it is the only source. *Smith v. State*, 603 S.W.2d 846 (Tex.Cr.App.1980) deals with an indictment for injury to a child that was found inadequate because § 6.01(c) of the Penal Code was not satisfied. The indictment failed to allege any statutory duty to act. Section 12.04 of the Family Code is cited as imposing a duty of support only on the child's parent(s), but is not discussed as the exclusive source of that duty. Considering that Tex.Fam.Code Ann. § 4.02 (Supp.1985) of the Family Code, by its language, imposes a duty to support one's child, it is not supportable to find the exclusive source of a duty to support in § 12.04 of the Family Code. *See also Harrington v. State*, 547 S.W.2d 621 (Tex.Cr.App.1977) (murder indictment; § 4.02 of Family Code cited as well as § 12.04).

Appellants' attempt to read the indictment as alleging two separate offenses is based in part on their contention that none of the language is surplusage (and that the State is now "estopped" from so claiming) and that the indictment alleges all of the essential elements of § 25.05 of the Penal Code. Appellants focus on the State's attempt to "explain" the indictment, where the State says that it has "gone on to" allege all of the elements of § 25.05. Appellants interpret the State's remarks as meaning that the elements of § 25.05 are in the indictment, if the indictment indeed contains them, to charge a separate offense rather than to satisfy § 6.01's requirements. One phrase to which they point as being an element of § 25.05 is "knowingly omitting to provide the *minimal* requirements ... medical care, ..." (emphasis in original). They claim this phrase refers to § 25.05(c) making it an offense to fail to furnish the minimal requirements for support. The phrase can also be read as a description of the support they failed to furnish; *i.e.*, they failed to furnish food and medical care (as opposed to shelter, clothing, or education, all of which are included as forms of support under § 12.04 of the Family Code.) Appellants also point to the phrase "which they were legally obligated to provide" as being an element of § 25.05. Again, this phrase can be read as descriptive of a requirement under § 22.04. Section 22.04 says that an omission can constitute an offense. Alleging only an omitted act under § 22.04 would not be adequate in and of itself however,— one must allege some duty or otherwise satisfy § 6.01. *See Smith v. State, supra, Priego v. State*, 658 S.W.2d 655 (Tex.App. 1983, no pet.).

■ The rationale for the duplicity rule is not offended by this indictment. The defendants can readily ascertain that they are charged with causing serious bodily harm to their child by failing to provide him with the food and medical care that the law required them to provide.

While the indictment may not be particularly well-drafted, and while much of the language perhaps should have been stricken as surplusage, we find that the indictment does not charge the Galvans with two distinct offenses but rather tracks the statutory language of § 6.01 of the Penal Code

**668**

by which an offense by omissive conduct requires either a statute imposing a duty to act or a statute making the omission a crime. In this case, we have both alternatives, properly pleaded in the conjunctive, as alternative theories of the same offense. We overrule appellants' first ground of error.

## DR. NORTON'S TESTIMONY

By their second ground of error, the Galvans assert that the trial court erred in allowing Dr. Linda Norton to testify as an expert witness because: (1) she was not a competent witness; and (2) her testimony was cumulative and bolstering of Dr. Bayardo's testimony.

▆▆ The general principles concerning competence of expert witnesses are well established. Membership in the profession to which the matter relates is not adequate to qualify as an expert. The person must possess special knowledge about the specific matter on which he proposes to give an opinion. The special knowledge that qualifies a witness as an expert may be derived entirely from a study of technical works, or special education in an area, or practical experience, or varying combinations thereof. *Holloway v. State,* 613 S.W.2d 497 (Tex.Cr.App.1981). The trial court has wide discretion to determine whether a witness offered as an expert possesses the required qualifications. That determination will not be disturbed except upon a showing of a clear abuse of discretion. *Steve v. State,* 614 S.W.2d 137, 139 (Tex.Cr. App.1981). We find that the trial court did not abuse its discretion when it determined that Dr. Norton qualified as an expert witness.

▆▆ Dr. Norton testified that she was a board-certified pathologist who had many years of experience as a medical examiner before establishing a private practice in Dallas, specializing in consulting on child abuse cases. Her principal work as a medical examiner in Dallas involved autopsies on children. She did most of the child death cases in Dallas County for five years. Dr. Norton's other professional credentials included lecturing to various groups such as the American Society of Clinical Pathologists and writing a chapter on child abuse in a textbook on forensic pathology.

Dr. Norton has the requisite special knowledge about the matters on which she testified. The number of autopsies on children that Dr. Norton had performed as a medical examiner would seem to be enough, in and of itself, to establish her qualifications to testify concerning possible explanations for a given set of autopsy findings; specifically, whether the findings fit patterns consistent with death by abuse or neglect and inconsistent with sudden, unexplained, infant death ("crib death" or Sudden Infant Death Syndrome [SIDS]). In addition to her practical experience, there was some evidence of study and education in the area of infant death. In point of fact, to be the medical examiner responsible for autopsying the majority of infant deaths in Dallas County and to not be familiar with areas such as SIDS, infant breathing patterns, child abuse indicators, etc., would be tantamount to an admission of gross incompetence on her part. There is sufficient evidence that Dr. Norton qualified as an expert in the areas about which she testified. We hold that the trial court did not abuse its discretion in finding her a competent witness.

▆▆ The Galvans assert that the sole reason for, and effect of, Dr. Norton's testimony was to add credence and weight to earlier unimpeached evidence offered by the same party; *i.e.,* Dr. Bayardo's testimony about the cause of death and the likelihood of an alternate cause such as SIDS. They claim that Dr. Norton's testimony was not required to "rebut any cloud upon Dr. Bayardo's credibility." The defense, in its cross-examination of Dr. Bayardo, brought up two medical experts with whom Dr. Bayardo was unfamiliar, forcing him to admit he was not familiar with their work. This is significant because Dr. Bayardo had not heard of the author of one of the works mentioned that controverted one of Dr. Bayardo's firmest statements as to why

the Galvan baby's autopsy results were inconsistent with a diagnosis of SIDS. The fair import of this portion of the testimony is that Dr. Bayardo may not be particularly well-qualified in the area of diagnosing SIDS.

Dr. Norton's testimony also served to rebut contentions first raised on cross-examination. Dr. Bayardo's testimony about SIDS was very limited. He testified that the autopsy findings were not consistent with those in SIDS cases. The uses of an apnea monitor and the possible genetic basis of SIDS were first raised by the defense on cross-examination. The apnea monitor was raised when Dr. Bayardo was asked if it would change his diagnosis if he knew that other children of this couple were on an apnea monitor. Rose Galvan later testified that their baby (born after Christopher's death) was on an apnea monitor and that the monitor had gone off several times, indicating that the baby had stopped breathing for an abnormal period of time. The defendants were quite clearly implying that such a cessation of breathing might have been the cause of Christopher's death and that SIDS has a genetic basis. Dr. Norton testified that events other than a cessation of breathing could set off the monitor and that the monitor might be triggered by apnea spells from which a child would revive on its own (This is significant because the Galvans never had to administer resusitation to restore the child's breathing). Dr. Norton also testified that SIDS has no genetic basis.

The Galvans also complain that Dr. Norton's testimony was not relevant and that the rule of *Moore v. Grantham*, 599 S.W.2d 287 (Tex.1980), against testimony based solely on the *ex parte* statements of third persons, should have barred Dr. Norton's testimony. Dr. Norton's opinion was based upon the autopsy report and the photographs. An expert's opinion may not be based on statements or reports of third persons unless the statements are properly in evidence and the opinion is sought through hypothetical questions. *Moore v. Grantham, supra.* The photographs were entered into evidence. The autopsy report was not offered as evidence, but its contents were the same as Dr. Bayardo's testimony. The report was marked as a state's exhibit for the limited purpose of determining that its contents did not differ from Dr. Bayardo's testimony. The judge ruled that Dr. Norton must be questioned by the use of hypotheticals, which the prosecution did. Her opinion was therefore properly given. We overrule appellants' second ground of error.

## SUFFICIENCY OF THE EVIDENCE

By their third ground of error, the Galvans assert that the evidence is insufficient to support their conviction; that the State failed to prove beyond a reasonable doubt that the Galvans had the conscious objective or desire to cause serious bodily injury to their child, Christopher, by omitting to provide food and medical care. They claim that the unrebutted evidence shows that the Galvans purchased and provided food, medication, medical care, clothing, and toys for the child. What appellants ignore, however, is that the testimony on which they base their claim comes from their relatives and this testimony does not rebut the medical testimony or the testimony from the Department of Human Resources workers.

Both Dr. Bayardo and Dr. Norton testified that Christopher Galvan's death was caused by a combination of factors. There was no single blow, for example, that could be pinpointed as the cause of death. Dr. Bayardo detailed eight diagnoses for the child's condition at the time of death: neglect, based upon the child's overall appearance; pulmonary edema, possibly due to heart failure or asphyxia; mild, acute and chronic bronchitis, present for two to three months, which would have been evidenced by coughing; blunt trauma (bruises); laceration of the frenulum of the upper lip; severe, chronic, ulcerative diaper rash, present at least two to three months; malnutrition and dehydration, based on the child's low weight (twelve pounds, three ounces instead of the expected weight of

sixteen to seventeen pounds), loss of adipose (fatty) tissue, diminished skin turgor (elasticity), and shrunken thymus; and alcohol intoxication of 0.06%: Dr. Bayardo testified that there was no specific, unequivocal, positive, anatomical cause of death. None of the eight conditions by itself would have been fatal, but the combination of them caused death (to a reasonable degree of medical certainty).

Dr. Norton testified that the child died of a combination of active neglect, passive neglect, and active physical abuse. She testified that the child was malnourished; that its one-third reduction in body weight indicated chronic intermittent nourishment insufficient to sustain the child's life and growth. She also testified that the diaper rash had gone far beyond what she would call a diaper rash. The position of the rash indicated that the child had been lying face down in its own excrement for long periods of time as a regular matter. She testified that the small thymus and loss of adipose tissue indicated that the child had been under stress. Dr. Norton had perhaps the most telling summary of the cause of Christopher Galvan's death: "[I]t may sound strange to say that I think somebody could possibly die of. diaper rash, but I think in this particular case, we really may have somebody that could have possibly died of diaper rash." She also testified that even if the child had been treated a month before his death there may have already been some irreversible brain damage due to the malnutrition.

Dr. Talley testified that Christopher was healthy at birth, except for jaundice that was treated before he left the hospital. The Galvans did not bring the child back for his six-weeks checkup, but did bring him back when he was ten weeks old. The child had head lice, diaper rash, and an infection under the penis foreskin (severe enough so that a prescription medication, rather than an over-the-counter remedy, was necessary.) The child's weight was close to normal. The doctor said that the child had an overall odor as though it had not been properly washed. Dr. Talley also testified that the medicines should have

cleared up the child's problems in about two weeks and that he told Rose Galvan to bring Christopher back in about two months (from December 21st) for the rest of his shots. The next time he saw Christopher was on March 17th. He only saw the baby from a distance of three or four feet, clothed, and in an infant carrier. He said that it was not usual to examine a child who had been brought in to complete its shots unless the mother indicated that a problem existed, which Rose Galvan did not do.

Testimony from Dr. Talley's nurse, Sally Griesenbeck, indicated that the baby was dirty and had an odor (on the December 21st visit). She said that again on the March 17th visit the baby was dirty and had an odor; that he was unusually still and lethargic for a child of that age; and that she noted his failure to cry at the shot, which she considered an abnormal reaction. She also said that she did not have to remove the baby's diaper to give the shot, so she did not note the presence or absence of diaper rash.

Testimony from the Department of Human Resources workers indicated that they had had difficulty in seeing the baby to ascertain its condition. On one visit, Paul Galvan was shooting a gun for "target practice" when the workers arrived. They were also ordered off the property by Paul Galvan's brother-in-law. When Christopher was finally brought to a DHR office for a visit, he was kept wrapped in a blanket.

The Galvans never offered a satisfactory explanation for the child's condition at death. Various relatives testified that they had seen the child fed; that the child's diaper rash was being treated and was "clearing up"; that they had never seen the Galvans strike the child. They also testified that the entire family was concerned that Christopher did not appear to be developing as he should. He lacked muscle tone and was lethargic (n.b., a state that Dr. Norton said was consistent with malnutrition). They also said that they

were thinking of changing doctors and strongly implied that Dr. Talley's care was substandard and unsatisfactory. When confronted with the pictures of Christopher, however, none of them could provide an explanation of the discrepancy between the "slow," but basically healthy, child they had been describing and the obviously emaciated child portrayed in the photographs.

■ The trier of fact is the judge of the credibility of witnesses and the weight to be given their testimony and may accept or reject all or any part of a witness' testimony. *See, e.g., Thomas v. State*, 605 S.W.2d 290 (Tex.Cr.App.1980). The jury heard the evidence. They heard the State's medical evidence. They heard that the child's conditions were readily treatable and should not have been present at the child's death had they been so treated. The jury heard testimony concerning the Department of Human Resources' attempted intervention. They heard that most people never saw the child except in a covered-up state. The testimony that they heard concerning the child's "slow" development came only from the Galvans and indeed describes a state consistent with that of a malnourished child. The jury could have believed the Galvans' version of events—"crib death," harassment by the Department of Human Resources, a tragic chain of circumstantial evidence. The jury could have believed that the Galvans, through some combination of ignorance, financial problems and hostility toward people they perceived as interfering bureaucrats, had learned a terrible lesson and are much more careful with their newest child. Or they could believe the State's version—the child died due to neglect, and the parents only "cleaned up their act" with regard to the youngest child's care after charges were brought concerning Christopher's death. The State has introduced enough evidence that no person could have allowed Christopher Galvan to reach the deteriorated physical condition that he was in at the time of his death without having the conscious objective or desire to do so. A rational trier of fact could have found this essential element of the offense of injury to a child had

been proved beyond a reasonable doubt. We overrule appellants' third ground of error.

## FUNDAMENTAL ERROR IN THE JURY CHARGE

■ By their fourth ground of error, the Galvans complain of error in the jury charge. At the outset, we note that appellants first raised their complaints concerning the jury charge in a supplemental brief. A new ground of error, not raised in the original brief, is not properly before the Court for review. *Coleman v. State*, 632 S.W.2d 616 (Tex.Cr.App.1982).

Appellants assert, in their ground of error, that the trial court committed fundamental error in the jury charge by authorizing a conviction for conduct which did not constitute an offense. They claim that the charge allowed a conviction for the offense of criminal nonsupport, Tex.Pen. Code Ann. § 25.05 (1974). Since § 25.05 was declared unconstitutional in *Lowry v. State*, 671 S.W.2d 601 (Tex.App.1984), a conviction under § 25.05 would convict them for conduct which did not constitute an offense. Subsequent to the filing of appellants' supplemental brief, however, the Court of Criminal Appeals held that only one section of the statute, § 25.05(f), was unconstitutional. *Lowry v. State*, 692 S.W.2d 86 (Tex.Cr.App.1985). Section 25.-05(f) made a defendant's inability to provide the support that he was legally obligated to provide an affirmative defense to prosecution. This section impermissibly shifted the burden of disproving an element of the offense to the defendant. The State must prove the defendant's ability to support the child. *Id.* at 87.

■ The court's charge in the current case does not suffer from the defect at issue in *Lowry*. The court's charge did not instruct the jury both on the State's burden of proof on the issue of defendant's ability to provide support and on the defendant's burden of proof on the affirmative defense of inability to provide support. The charge required the State to prove that the Gal-

**672**

vans had the duty by statute to provide support, and that they could have provided and were legally obligated to provide that support. The jury was never asked to consider inability to support as a defense. The charge in the current case, therefore, does not involve the portion of § 25.05 that was declared unconstitutional in *Lowry*, assuming that § 25.05 is involved in the charge at all.

If the State needed to prove that the Galvans had the ability to support their child, it has done so. The Galvans asserted or implied in several ways that financial difficulties were common and that such difficulties were the reason why Christopher was not taken to the doctor as scheduled. Specific facts were in short supply, however. Rose Galvan testified, for example, that they did not have enough money in March and April to take Christopher to the doctor, even though Paul was working during that period. Paul testified that he was paid must less than he was supposed to be paid because the business that he worked for was just getting started, yet on cross-examination he admitted to receipt of $600.00 in cash on April 2, and to receipt of $3,121.40 during the previous December and January. The Galvans owned their house. They had no mortgage or rent payments, only utility payments. Their house was furnished, except for Christopher's lack of a crib. There is nothing to indicate that they had ever attempted to avail themselves of any social services on the grounds that they were unable to provide the necessary care for their child. The State has shown enough evidence to prove that the Galvans were able to provide the support that they were legally obligated to provide.

Under their ground of error concerning fundamental error in the jury charge, appellants also raise complaints other than those based on *Lowry v. State, supra.* The basic complaint seems to be that the jury charge was confusing and deprived the appellants of a fair and impartial trial. These complaints are not properly before us as they were raised for the first time in the supplemental brief. *Coleman v. State,*

*supra.* We overrule appellants' fourth ground of error.

The judgment of the trial court is affirmed.