Felicia WHEELER, Appellant,

v.

The STATE of Texas, Appellee.

No. 03–95–00547–CR.

Court of Appeals of Texas,
Austin.·

Aug. 28, 1997.

Walter C. Prentice, Austin, for Appellant.

Ronald Earle, District Attorney, Philip A. Nelson, Jr., Assistant District Attorney, Austin, for Appellee.

Before JONES, B.A. SMITH and DAVIS *, JJ.

---

* Before Tom G. Davis (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1988).

DAVIS, Justice (Retired).

A jury found appellant guilty of the offense of intentionally or knowingly causing serious bodily injury to a child by failing to provide medical care for the child when appellant had assumed care, custody and control of the child. *See* Tex. Penal Code Ann. § 22.04 (West 1994). The trial court assessed punishment at confinement for twenty years. Appellant asserts three points of error, contending that error occurred in the trial court because: (1) the evidence was legally insufficient to support the verdict; (2) the evidence was factually insufficient to support the verdict; and (3) the trial court failed to grant a new trial based on newly discovered evidence. We will reverse the trial court's judgment and reform to reflect an acquittal.

Appellant was found guilty of the second count of a two-count indictment of an offense under Section 22.04 of the Texas Penal Code, providing:

(a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual:

(1) serious bodily injury;

(2) serious mental deficiency, impairment, or injury; or

(3) bodily injury.

The first count charged appellant with knowingly and intentionally causing serious bodily injury to a child. The jury found appellant not guilty on this count. The second count upon which the jury found appellant guilty charged appellant with "intentionally and knowingly, by omission, caus[ing] serious bodily injury to Andrew Devante Pettigrew, a child fourteen (14) years of age or younger, by failing to provide medical care for the said Andrew Devante Pettigrew, when Felicia Wheeler was then and there the caretaker of said Andrew Devante Pettigrew, and had assumed care, custody and control over Andrew Devante Pettigrew." The offense is a first degree felony when the conduct is committed intentionally or knowingly. When the conduct is engaged in recklessly, the offense is a felony of the second degree. *See* § 22.04(e).

The victim, an 18–month old male child, was pronounced dead at 3:30 a.m. on November 18, 1993, at the pediatric intensive care unit at Brackenridge Hospital. Dr. Jeffery Lava, a diagnostic radiologist performed a CT scan and an arteriogram on the victim that showed a fracture to the left parietal bone in the skull. Dr. Lava believed that the injury occurred several hours before 6:00 p.m. or earlier. The fracture resulted in so little blood flow to the brain that the child was brain dead. Dr. Brian Neely, a neurological surgeon, testified the victim had a major injury of the type that results from falling out a second story window or falling from a fast moving car. Dr. Neely opined that this type of injury could not have been caused by slipping or falling on the floor. Nor could it have been caused by the shaking syndrome. Dr. Robert Bayardo, chief medical examiner for Travis County, performed a postmortem examination of the victim. Dr. Bayardo opined the victim died as a result of a severe closed head injury with a fractured skull and right subdural hemorrhage by being pushed or thrown forcibly against a flat surface. The injury required much more force than falling from a bathtub against a commode or hitting his head against a piece of furniture.

■ In reviewing the legal sufficiency of the evidence, we must determine whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Since the State relies on circumstantial evidence to meet its burden of proof, we note that this is a post-*Geesa* case. Thus, the standard of review is the same for direct and circumstantial evidence. *See Geesa v. State,* 820 S.W.2d 154, 162 (Tex.Crim.App.1991). The nature of the evidence in the instant cause requires an in-depth review of the facts.

Becky McNeil (Becky) took custody of the victim (Andrew) in August 1993 after his mother, Becky's great-niece, had to surren-

der custody of her children to Becky, her mother and sisters, because of the natural mother's narcotic addiction. Andrew needed daycare while Becky and her then live-in boyfriend, James Farris (James), were at work. Becky's sister, Tracey Yancey (Tracey), had known appellant two to three years, and it was through this connection that Becky arranged for appellant to keep Andrew weekdays from 6:30 a.m. to 4:30 p.m. Appellant was paid forty to fifty dollars a week for taking care of Andrew.

Becky described Andrew as a normal child who had not experienced any problems falling down at her house. Two weeks prior to his death, she observed bruises he had sustained at appellant's home. In reply to Becky's inquiry, appellant stated that Andrew had fallen a number of times, and on one occasion, he had fallen on a pile of rocks in her yard. The night before his death, Andrew slept with James. Becky stated that James played too rough with Andrew, but their "roughhousing" had not shown any ill effects.

Becky's daughter, Charlene, took Andrew to appellant's house on November 17, 1993. Appellant called Becky at work about 10:00 a.m. to report that Andrew was fussy and asked how he had been before leaving her house. Becky advised appellant to lay him down because he might be pouting as the result of a spanking she had given him that morning; she had spanked his legs with her hands twice that morning. Becky was surprised by appellant's call because she had never called her at work before. Becky's time card at Reid's Cleaners on Far West showed she left work at 3:57 p.m. on November 17. James, and Becky's daughter Taneya, picked Becky up from work around 4:15 p.m. They drove to appellant's house on Rundberg Lane to get Andrew. Becky described Andrew as all "scrunched up and squirming" when appellant handed him to her. Appellant told her that he had been like that all day; Andrew had "pooped" in the tub, but she made no mention of a fall.

Becky testified that she called 911 within three to five minutes after arriving home. After E.M.S. arrived, Andrew was taken to the hospital. Early the next morning, Becky agreed to the removal of life support when she was told that nothing else could be done.

James was living with Becky at the time in question. They were married fourteen months prior to trial. James testified that he was a welder and an associate minister at New Hope Trinity Baptist Church. James had not been to school to study for the ministry. He had gone to seminary and was ordained by his pastor in Warren. He was known as Brother Penguin Farris. James observed Andrew crying a lot on the night of November 16 but stated that he seemed alright the next morning. James had seen a knot on Andrew's forehead, and a week earlier he had noted a cut on Andrew's lip. He had "kind of roughhoused and tumbled around with him [Andrew]." The only way he ever disciplined him was by slapping his hands. When he and Becky arrived at appellant's house at about 4:30 p.m. on November 17, appellant told them that Andrew was asleep and he had cried all morning. James described Andrew as "limp, stiff, drawn up like a ball" when appellant brought him to Becky. When they arrived home, James went to take a shower because he had a sermon to preach that night. After showering, James learned that E.M.S. was at the house. Andrew was whimpering and crying a little bit. James heard Becky tell E.M.S. that appellant told her that Andrew had fallen in the bathtub.

James stated that he had been to prison. He had been placed on probation for burning his ex-wife's clothing. He testified that his probation was revoked for failing to make restitution. Under cross-examination, James agreed he failed to comply with other conditions of probation by failing to report to the Austin Stress Clinic and failing to report to his probation officer. While he was in the Texas Department of Corrections, James went to drug and alcohol abuse classes because someone recommended it, but James denied having drug and alcohol problems.

Darlene Rector, an emergency medical technician with E.M.S., testified that her unit responded to a call about an unconscious person on the afternoon of November 17, 1993. Upon arrival at 4:45 p.m., she found a baby "crying and combative and then he'd go

flaccid." One eye was larger than the other, indicating bleeding in the brain. Becky told Rector that they had just brought the baby from a babysitter's and had found him in this condition. Rector contacted appellant who told her that a few hours earlier the baby had a bowel movement in the bathtub, "this frightened him, and he climbed out of the tub, slipping because he was wet, and struck his head on the commode." Appellant told her that he cried, then he was fine, but he slept a lot after that. Rector did not observe the baby in a fetal position. Kurtis Brown, a paramedic and the person in charge of the ambulance, testified about observations of the injured baby that conformed with those given by Rector. Brown noted that the people at the scene were nervous, but he was unable to discern whether they were nervous about being found out, or whether they were nervous about the condition of the baby.

Becky's daughter, Charlene Grant, age 17 at the time of trial, testified that she usually took Andrew to appellant's house about 6:30 a.m. before she caught her bus for school. Andrew "whined" a lot, but she had been told by a "lot of people" that this was true of "drug babies." Andrew had asthma and breathed a little harder than normal. She did not remember that much about Andrew's condition when she left him at appellant's home on the day in question, but that "he was fine." Charlene recalled that Andrew was up all night the previous evening watching TV with James.

Becky's sister Tracey had known appellant for two or three years. She saw Andrew at appellant's house at lunchtime and sometimes after work. Tracey talked to appellant on the telephone at ten or eleven on the morning of November 17. Appellant told Tracey that Andrew "wasn't doing too good," and that she had called Becky at work. Appellant called Tracey the night of November 17 to tell her that her sister was trying to blame her for something, she had been under questioning, and she was very surprised. Appellant had told Tracey that she sometimes had to spank Andrew with a shoe. Tracey had seen James play "roughly" with Andrew. Tracey was bothered by James picking Andrew up by his head. She had

observed Becky shake Andrew and yell at him. Tracey stated James had a temper and he had pushed her when he was mad at her. She described Becky as having somewhat of a temper, but mostly she was a "yeller." Appellant had discussed with Tracey the need for Becky to take Andrew to a doctor to be examined for worms and other problems.

Cynthia Campbell, a witness for the State, testified she and appellant were good friends. Campbell saw appellant about three times a week. Appellant called Campbell about 1:00 p.m. on November 17. Appellant told Campbell that she had called Becky that morning to pick up Andrew because he was sick. Appellant said Becky had agreed to pick him up at 1:00 p.m. but she had never shown up. Campbell called appellant the next day to tell her that she had seen on television that Andrew had died. Campbell stated that appellant cried and was very emotional. Appellant told her that she knew that Andrew was ill, and she believed if Becky had picked him up earlier that he would have been saved. Appellant further related to Campbell that Becky told her that there was nothing wrong with Andrew; that he was upset because she had whipped him that morning. Appellant did not tell Campbell that Andrew had fallen and hit his head. Appellant said that she thought he was in pain because of an ear infection.

Under cross-examination by defense counsel, Campbell stated that she had three children and they loved to go to appellant's house. Campbell felt that appellant was giving Andrew good care. Appellant told Campbell that they (Becky and her family) brought Andrew to her house with bruises, some of which appellant showed her. Andrew had "like ten ring worms in his hair, and it had like went on his skin." Appellant bought ointment to put on Andrew's head. Campbell testified that appellant had bought Andrew a jacket, pants, a pair of shoes and a shirt. Campbell went to a fish fry at appellant's house when Becky and James were guests. The subject of disciplining Andrew was discussed. Becky told appellant to "pop him in the mouth and just make him get your attention." Appellant said she couldn't do this. James said he spanked Andrew and

put him in a closet when he cried. Campbell said she had left her children with appellant and she believed appellant took good care of them. Under redirect, Campbell admitted she had been convicted of prostitution and theft.

Sergeant Michael Nyert of the Austin Police Department talked to appellant at her house about 10:00 p.m. on November 17 after having been advised of all the people who had recent custody of the victim. Based on information he had received that Andrew had fallen out of a bathtub, he asked appellant to show him where the baby had bathed. Appellant told the officers that while she was bathing Andrew there was a phone call, and she had left the bathroom to answer the call. When she returned, Andrew was "laying in between the commode and the bathtub." Appellant and her husband were willing to accompany the officer to the station house where appellant expressed a willingness to sign a statement. The first interrogation took about three hours. The matter concerning Andrew getting out of the tub and falling when appellant went to answer the telephone was detailed in this statement. After determining that appellant could not read the statement, Nyert read the statement he had typed and appellant signed it. A second statement followed in which appellant detailed how she had hit Andrew on his butt with a belt when he refused to obey her about staying in bed. Andrew tried to get out of the way and hit his head on the dresser. Appellant felt that he must have hit the dresser "pretty hard" because he cried. The bathing of Andrew followed this incident. In the second statement, appellant stated that she heard a "bam" when she went to answer the telephone. She could tell it resulted from Andrew hitting his head against the toilet. Sergeant Nyert again read the statement to appellant and she signed it at 4:22 a.m. on November 18, 1993.

Appellant testified she told officers she hit Andrew with a piece of belt that did not have a buckle on it. When she called Becky that morning, Becky told her that she would call back about 1:00 p.m., but she failed to call. Becky had further told appellant that she would be at her house to get Andrew a little after one o'clock if she did not call. Andrew was wheezing and had a problem breathing when he was brought to her on November 17. When Becky came after Andrew, appellant went to a bedroom where Andrew was sleeping with her son. Appellant carried Andrew to Becky who stood him on the floor but he was unable to walk. Becky shook Andrew. Appellant told Becky to never shake him in her house. Becky carried Andrew away crying. Appellant described how James would always pick Andrew up by his head. Under cross-examination, appellant testified that she was placed on probation after being convicted for theft in Dallas County.

Dr. George Parker, Ph. D., a licensed psychologist, saw appellant as a patient and was retained by appellant to testify. Dr. Parker's examination showed that appellant had a "full scale I.Q. of 69." Dr. Parker testified that appellant was diagnosable as "mentally retarded." After examining appellant and reviewing James' record, Dr. Parker opined that James was more capable of injuring a child than appellant.

Three witnesses testified that appellant had taken care of their children. All of them stated that their children were well cared for by appellant. One of these witnesses, Charles Ferguson, testified that he was a neighbor; that he had seen Andrew at appellant's house on the morning of November 17 and told appellant that something was wrong with him and suggested appellant call his parents.

Appellant's son, Terrance Stinnette, age 17 at time of trial, testified that he came home from school about 2:00 p.m. on the day in question. Andrew was walking around and crying. He picked Andrew up and they watched cartoons on T.V. Terrance decided to take a nap and he held Andrew on his chest. They both went to sleep and slept until appellant came to take Andrew to Becky and James. Terrance stated that he had been disciplined by appellant but she had never struck him.

Leo Leija was Becky and James's neighbor. Leija was working in his yard in November 1993 when he heard a baby crying at the top of his lungs. He heard someone who

sounded like Becky scream, "shut up, god dammit," and all of a sudden, the baby stopped crying. A week or two after Andrew died, Becky threw James's clothes out of the house and "smacked" the windshield on James's truck with a stick or a bat.

Appellant's husband, Billy Wheeler, testified that appellant had been taking care of children off and on for a long time. The night that Becky and James played cards at their house, Becky said she would whip Andrew if he acted up. James said he would slap Andrew and put him in a closet. He had never heard appellant scream at children and had never seen her spank a child with anything but her hand.

Becky and James were recalled by appellant. Becky stated that she had never hit Andrew but that she had spanked him. She denied that James ever had voodoo trances or spells. However, James testified that a woman living across the street sprinkled voodoo powder around his house and told him the only way to remove the spell was to burn his ex-wife's clothing.

Dr. Gordon White, a neurosurgeon, reviewed the X-rays, angiograms, clinical findings, microscopic slides, and post mortem slides and pictures taken at the time of the child's autopsy. Dr. White opined that the fatal injury was caused by a blunt injury to the head, the resulting blood clot had been there only for minutes or hours. Dr. White stated that he was not being paid to testify

■ In considering the sufficiency of the evidence to support the conviction, we must be mindful that the jury found appellant not guilty of intentionally or knowingly causing serious bodily injury to a child. Nor was appellant convicted of the lesser offense of recklessly causing injury to a child. While numerous cases are annotated under section 22.04 relating to intentionally causing serious bodily injury to a child, we find very few cases that consider the sufficiency of the evidence under the omission portion of the statute. In the instant cause, the State had the burden of proving beyond a reasonable doubt that appellant had the "conscious objective or desire" to cause serious bodily injury to the victim by failing to provide medical care for the victim when appellant

was then and there the caretaker of the victim, and had assumed care, custody and control over the victim. See Galvan v. State, 699 S.W.2d 663, 671 (Tex.App.—Austin 1985, pet. ref'd.). In Galvan, medical testimony showed the child's death was caused by a number of factors. Eight diagnoses were detailed, to wit: neglect, based on the child's overall appearance; pulmonary edema, possibly due to heart failure or asphyxia; mild, acute and chronic bronchitis, present for two or three months; blunt trauma (bruises); laceration of the upper lip; severe, chronic, ulcerative diaper rash, present at least two or three months; malnutrition and dehydration, loss of fatty tissue, diminished skin elasticity, and shrunken thymus; and alcohol intoxication of 0.06 %. Id. at 670. Another doctor stated, "strange as it seemed," this was an instance in which a child could have died from diaper rash. Id. Even if the child had been treated a month before his death, expert testimony showed there may have been irreversible brain damage due to malnutrition. The child was shown to have been healthy at birth. Department of Human Resources (DHS) workers had difficulty seeing the child. On one occasion when they approached the defendant's father's residence, the defendant was shooting target practice and his brother-in-law ordered the DHS workers to leave the premises. The defendants, mother and father of the child, failed to offer satisfactory explanation of the child's condition at death. This Court held that a rational trier of fact could have found beyond a reasonable doubt the essential element that no person could have allowed the victim to reach the condition he was in at the time of death without having the conscious objective or desire to do so. Id. at 671.

In Elliott v. State, 768 S.W.2d 351 (Tex. App.—Corpus Christi 1989, no pet.), the court found that the defendant's written judicial confession was sufficient to support the conviction. Nevertheless, the court reviewed the sufficiency of the evidence to determine whether the defendant father had intentionally failed to provide his infant son with timely and adequate medical attention. An autopsy showed the victim died as a result of blunt trauma to the head inflicted ten days

prior to the autopsy. Results of the autopsy also showed that the victim had sustained fifteen rib fractures ten to fifteen days earlier. In addition, the infant had acute bronchitis. Subsequent to the injuries, the defendant failed to heed the advice of child abuse officials on two occasions to present the victim for X-rays and medical tests. The court held that any rational trier of fact could have found beyond a reasonable doubt that the defendant intentionally and knowingly engaged in conduct that caused serious bodily injury to the victim by failing to provide the victim with timely and adequate medical attention, which the defendant father of the victim had a statutory duty to provide. *Id.* at 353.

An essential element of the instant offense is that the person has assumed "care, custody, or control of the child." Sec. 22.04(b)(2). The actor has assumed care, custody and control of the child "if he has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he has accepted responsibility for protection, food, shelter and medical care for a child." Sec. 22.04(d). The parties do not raise any question about this element of the offense. Consequently, we do not consider it.

The State correctly urges that the jury, as trier of the fact, was the judge of the credibility of the witnesses and the weight to be given their testimony and could accept all or any part of a witness' testimony. *See Thomas v. State,* 605 S.W.2d 290 (Tex.Crim.App. 1980). It is undisputed that appellant called Becky about 10:00 a.m. on the day in question about her concern for Andrew and Becky responded that Andrew was upset because she had spanked him before he was taken to appellant's house. Becky advised appellant to put him to bed. Witnesses for the State and appellant testified that appellant was either retarded or unable to read and write. Appellant's condition should have been apparent to Becky and a cause for concern about whether appellant knew what to do in case of a medical crisis. Becky's daughter Charlene, a State's witness, testified that Andrew "whined a lot," had asthma and breathed harder than normal. It is undisputed that Andrew was a "drug baby" and suffered problems that are common with such unfortunate children. While the jury could have disregarded defense witnesses' testimony that appellant had taken care of their children without any problem, no testimony was offered to contradict them. It was through Becky's sister Tracey that appellant was hired for Andrew's day care. Tracey, a State's witness, testified that she talked to appellant on the day in question. Appellant expressed concern about Andrew's condition. She told Tracey that she had called Becky about him. Another State's witness, Cynthia Campbell, testified that appellant was giving Andrew good care and that she had placed her children with appellant for day care. Cynthia had a telephone conversation with appellant on the day in question. Appellant expressed concern about Andrew's condition and advised Cynthia that she had called Becky.

In *Galvan,* a DHS representative attempted to intervene and was not allowed to see the child whose parents had allowed the child to suffer numerous severe physical problems over a period of time. In *Elliott,* the father refused to heed advice to get medical attention for his child who had suffered a fractured skull and fifteen broken ribs. Clearly, the State bears a heavy burden to prove beyond a reasonable doubt that an accused had the conscious objective or desire to cause serious bodily injury to a child, by failing to provide medical care. Perhaps, this accounts for the difficulty encountered in finding reported cases. Bearing in mind that the jury expressly found appellant not guilty of causing serious bodily injury to the victim, the instant cause is clearly distinguishable on its facts from *Galvan* and *Elliott.*

Viewing the evidence in the light most favorable to the prosecution, we are unable to hold that the evidence supports the jury's finding beyond a reasonable doubt that appellant had the conscious objective or desire to cause serious bodily injury to the victim by failing to provide medical care for the victim. Appellant's first point of error is sustained. Our disposition of this point of error renders it unnecessary to consider appellant's remaining points of error.

The conviction is reversed and reformed to reflect an acquittal.

JONES, Justice, dissenting.

I respectfully dissent.

The majority has adequately set forth the relevant evidence. On the basis of that evidence, appellant was convicted of intentionally *or knowingly* injuring the child victim. The Penal Code provides that "[a] person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." Tex. Penal Code Ann. § 6.03(b) (West 1994). Considering *all* the evidence, and viewing it *without* the prism of "in the light most favorable to the prosecution," I believe the verdict is probably so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Clewis v. State,* 922 S.W.2d 126 (Tex. Crim.App.1996); *Stone v. State,* 823 S.W.2d 375 (Tex.App.—Austin 1992, pet ref'd, untimely filed).

Viewing the evidence through that prism, however, effectively requires an appellate court to consider only the evidence that supports the verdict. *Clewis,* 922 S.W.2d at 132 n. 10. *See also Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Villalon v. State,* 791 S.W.2d 130, 132 (Tex.Crim.App.1990). Here, the record contains evidence that when the child was returned to Becky at about 4:15 p.m., he was "limp, stiff, drawn up like a ball." Also that he was "scrunched up and squirming," and that he "had been like that all day." There is also evidence that within 3 to 5 minutes after arriving home with the child, Becky was alarmed enough to call 911. Since it was so obvious to Becky that the child needed emergency medical care, and since there was evidence he had been like that for the better part of the day (while he was with appellant), a reasonable jury could, it seems to me, infer that appellant must also have realized the seriousness of his injury and his desperate need for immediate medical care. Accordingly, I would overrule appellant's point of error challenging the legal sufficiency of the evidence.